1
2
3
4

Todd M. Logan (SBN 305912)
tlogan@edelson.com
EDELSON PC
329 Bryant Street, Suite 2C
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

5
6
7
8
9

Jay Edelson*
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

10   *Motion for admission pro hac vice to be filed

11   Counsel for Plaintiff and the Putative Class

12

### IN THE UNITED STATES DISTRICT COURT

13

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

### SAN FRANCISCO DIVISION

15
16

JUSTIN BAKER-RHETT, individually and
on behalf of all others similarly situated,

17

*Plaintiff,*

18

*v.*

19
20

ASPIRO AB, a Norwegian limited liability
company, and KANYE WEST, an
individual, together d/b/a TIDAL,

21

*Defendants.*

22

Case No.: 3:16-cv-02013

**CLASS ACTION COMPLAINT
FOR:**

**(1)   Violations of Cal. Bus. & Prof.
Code § 17500;**
**(2)   Violations of Cal. Bus. & Prof.
Code §§ 17200, *et seq.*;**
**(3)   Fraudulent Inducement; and**
**(4)   Unjust Enrichment.**

**DEMAND FOR JURY TRIAL**

23
24
25
26
27

      Plaintiff Justin Baker-Rhett brings this Class Action Complaint and Demand for Jury

Trial against Defendants S. Carter Enterprises, LLC ("SCE") and Kanye West (collectively

"Defendants"), based upon their conduct of fraudulently inducing consumers to subscribe to

Tidal—a subscription-based music streaming service owned by Defendants. Plaintiff Baker-

28

CLASS ACTION COMPLAINT                                      CASE NO. 3:16-CV-02013

Rhett alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## NATURE OF THE ACTION

1.      Tidal is a music streaming service that music mogul Shawn "Jay Z" Carter purchased in 2015 and subsequently thrust into the public dialogue.

2.      Though Jay-Z's star-studded 2015 "re-launch" garnered Tidal significant media attention,[1] dedicated subscribers did not follow.

3.      By early 2016, Tidal was quietly teetering on the brink of collapse. Many industry experts predicted its imminent demise absent a significant swell in users and a new round of publicity.

4.      Fortunately for Tidal, help arrived just in the nick of time. International hip-hop superstar Kanye West, who owns a portion of Tidal, promised to release his long anticipated new album "*The Life of Pablo*" exclusively on Tidal. Specifically, Mr. West promised on Twitter that the "album w[ould] never never never be on Apple. And it will never be for sale… You can only get it on Tidal."[2]

5.      Mr. West's unequivocal declaration of Tidal's exclusive access to his album had a profound impact on Tidal's business. New subscriptions to the streaming platform skyrocketed, tripling its consumer base from 1 million to 3 million subscribers in just over a month.[3] According to Tidal, *The Life of Pablo* was streamed 250 million times in the first 10 days. Each new subscriber that signed up, including those who signed up for a "free" (*i.e.*, negative option)

---

[1]     *See* Todd Spangler, *Jay Z Launches Tidal Streaming-Music Service at Star-Studded Event* (March 30, 2015), http://variety.com/2015/digital/news/jay-z-launches-tidal-streaming-music-service-1201462769/ (last visited May 6, 2016).

[2]     *See* Danette Chavez, *Reports of The Life of Pablo's Tidal exclusivity have been greatly exaggerated*, A.V. Club (Apr. 1, 2016), http://www.avclub.com/article/reports-life-pablos-tidal-exclusivity-have-been-gr-234694 (last visited May 6, 2016).

[3]     *See* Charlotte Hassan, *Kanye May Have Single-Handedly Doubled Tidal's Subscribers…*, Digital Music News (Feb. 24, 2016), http://www.digitalmusicnews.com/2016/02/24/tidal-subscriber-numbers-surge-after-exclusively-releasing-kanyes-album/ (last visited May 6, 2016).

trial, submitted a credit card to be charged once the trial ended.

6.      Mr. West's promise of exclusivity also had a grave impact on consumer privacy. For each new Tidal subscriber who signed up as a result of Mr. West's claims, Tidal obtained that consumer's email address, social media account information, and other personally identifiable information. Alarmingly, Tidal specifically targeted the "personal information" of minors as young as 13 years old.

7.      Mr. West's promise of exclusive access to *The Life of Pablo* conferred an enormous benefit upon Tidal: a *tripled* subscriber base, replete with access to the personal and financial data of its more than two million new subscribers.

8.      Contrary to Mr. West's representations, however, the purportedly "exclusive" access to *The Life of Pablo* that Tidal subscribers were promised was short lived. A month and a half after *The Life of Pablo's* initial release, Mr. West made the album available through Tidal's biggest competitors, Apple Music and Spotify. He also began selling the album through his own online marketplace.

9.      By the time Mr. West changed course and broadly released *The Life of Pablo*, the deceptive marketing ploy had served its purpose: Tidal's subscriber numbers had tripled, streaming numbers were through the roof, and Tidal had collected the personal information, credit card numbers, and social media information of millions of deceived consumers. As a result, Tidal's valuation—the lifeblood of any new startup—soared.

10.      Using publically available acquisitions as a comparable metric, the two million new users acquired as a result of its purportedly exclusive access to *The Life of Pablo* are worth as much as $84 million to Tidal.[4]

11.      Unfortunately for millions of American consumers, Tidal's windfall came at a great cost. Consumers were uniformly tricked into handing over their private data and credit card information by a singular mistruth.

---

[4]      *See infra*, ¶ 42.

CLASS ACTION COMPLAINT                              3                              CASE NO. 3:16-CV-02013

12.     In reality, neither Mr. West nor SCE ever intended *The Life of Pablo* to run exclusively on the Tidal platform. To the contrary, they—knowing that Tidal was in trouble but not wanting to invest their own money to save the company—chose to fraudulently induce millions of American consumers into paying for Tidal's rescue.[5]

13.     To obtain redress from these deceptive marketing practices, Plaintiff Baker-Rhett, on behalf of himself and a putative Class, brings this lawsuit seeking damages, disgorgement of Defendants' profits, and restitution. Additionally, Plaintiff seeks an order requiring Tidal to delete the private information of Plaintiff and the Class members that it collected, cancel all outstanding negative options of any free trials created during the class period, and cease any monetization efforts relying on the illegally obtained information.

## PARTIES

14.     Plaintiff Justin Baker-Rhett is a natural person and citizen of the State of California.

15.     Defendant S. Carter Enterprises, LLC, is a limited liability company existing under the laws of the State of Delaware with its principal place of business located at 1411 Broadway, New York, New York 10018. SCE conducts business throughout this District, the State of California, and the United States.

16.     Defendant Kanye West is a natural person and citizen of the State of California.

\*          \*          \*

---

[5]     Mr. West has boasted of his choice to use consumers' money—instead of his own—to advance his business interests, stating: "Yes I am personally rich and I can buy furs and houses for my family…but I need access to more money in order to bring more beautiful ideas to the world…If I spent my money on my ideas I could not afford to take care of my family. I am in a place that so many artist end up…**Also for anyone that has money they know the first rule is to use other people's money**." *See Kanye West Explains He's "Personally Rich" But Needs "Other People's Money" for Business Projects* (Feb. 15, 2016) (emphasis added), http://www.eonline.com/news/740077/kanye-west-explains-he-s-personally-rich-but-needs-other-people-s-money-for-business-projects (last visited May 6, 2016).

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the putative Class is a citizen of a state different from Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under the subsection apply to this action.

18.     This Court has personal jurisdiction over Defendants because they transact significant business in this District, including soliciting consumer business and entering into consumer and business contracts in this District, and the unlawful conduct alleged in the Complaint occurred in and emanated from this District.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants transact significant business in this District and a substantial part of the events giving rise to the Complaint occurred in and emanated from this District. Venue is additionally proper because Plaintiff resides in this District.

**INTRADISTRICT ASSIGNMENT**

20.     Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

**FACTUAL BACKGROUND**

**The Tidal Music Service**

21.     Tidal was originally launched in 2014 as a high fidelity music-streaming platform by a company named Aspiro.

22.     Soon thereafter, Project Panther BidCo Ltd., a holding company created by Defendant SCE (which is controlled by Jay Z) acquired Aspiro.[6]

23.     After acquiring Aspiro, Jay Z wasted no time announcing his plans for Tidal to the world. Within a month of acquiring the company, Jay Z announced that Tidal would "be the

---

[6]     *See Project Panther Bidco Ltd launches a recommended cash offer of SEK 1.05 per share to the shareholders of Aspiro AB*, http://www.aspiro.com/wp/wp-content/uploads/2015/01/Offer-press-release-Panther-protected.pdf (last visited May 6, 2016).

streaming home for artists like himself, Beyonce, Rihanna, Kanye West, Jack White, Arcade Fire, Usher, Nicki Minaj, Coldplay, Alicia Keys, Calvin Harris, Daft Punk, deadmau5, Jason Aldean, J. Cole, and Madonna."[7] Tidal was also touted as the first "artist owned" streaming service. Its initial stakeholders included world-renowned artists Alicia Keys, Win Butler, Regine Chassagne, Beyonce, Calvin Harris, Chris Martin, Daft Punk, deadmau5, Jack White, Jason Aldean, J. Cole, Madonna, Nicki Minaj, Rihanna, Usher, Jay Z himself, and Defendant Mr. West.[8]

24.      Each owner/artist was offered a three percent stake in the company in exchange for creating Tidal exclusive content to drive consumers to the subscription only streaming platform.[9]

25.      The founding stakeholders also committed their social media presence to promoting Tidal. Jay Z and other stakeholders, including Mr. West, leveraged their Twitter accounts to spread word of Tidal's re-launch to their massive Twitter followings.[10] (Kanye West has over 21 million Twitter followers alone.[11]) Twitter mass-marketing has been perpetually relied upon by both Tidal in its own capacity, as well as its owner-artists to buoy the service's subscriber base and their own album sales. *See* <u>Figure 1</u>.

---

[7]      *See* Andrew Flanagan, *It's Official: Jay Z's Historic Tidal Launches With 16 Artists Stakeholders*, billboard (March 30, 2015), http://www.billboard.com/articles/news/6509498/jay-z-tidal-launch-artist-stakeholders (last visited May 6, 2016).

[8]      *See Who Owns TIDAL*, TIDAL, *https://support.tidal.com/hc/en-us/articles/203055651-Who-Owns-TIDAL-* (last visited May 6, 2016).

[9]      *See* Andrew Flanagan and Andrew Hampp, *It's Official: Jay Z's Historic Tidal Launches With 16 Artists Stakeholders*, billboard (March 30, 2015) http://www.billboard.com/articles/news/6509498/ jay-z-tidal-launch-artist-stakeholders (last visited May 6, 2016).

[10]      *See* James Grebey, *Jay Z's New Tidal Streaming Service Has Turned Everybody's Avatar Blue*, SPIN (March 30, 2015), http://www.spin.com/2015/03/jay-z-tidal-streaming-launch-blue-twitter-kanye-west-arcade-fire-third-man/ (last visited May 6, 2016).

[11]      *See Kanye West*, Twitter https://twitter.com/kanyewest (last visited May 6, 2016) (identifying more than 21.9 million followers of Mr. West on Twitter).

---





Figure 1.

26.     Despite debuting to excessive fanfare, Tidal soon fizzled as a streaming service. Its inability to generate revenue led many in the music industry to believe the media platform faced almost imminent doom. In fact, a survey of fifty music executives conducted by Billboard "revealed that 71 percent of respondents th[ought] Tidal w[ould] be gone in a year or less[.]"[12] Circumstances were so dire that Tidal admitted in early 2015 that the company was not fully funded to last through the next twelve months.[13] It also conceded that the service would "have to achieve an extreme and unprecedented growth in number of subscribers simply to survive[.]"[14]

27.     It was during this dire period that world-renowned rap artist, entrepreneur, and polymath, Kanye West, announced the upcoming exclusive release of his latest album, *The Life*

---

[12]     *See* Max Willens, *Is Tidal Failing? Music Industry Executives Put Jay Z's Embattled Streaming Service on Deathwatch*, IBT (Aug. 27, 2015), http://www.ibtimes.com/tidal-failing-music-industry-executives-put-jay-zs-embattled-streaming-service-2071365 (last visited May 6, 2016).

[13]     *See* Max Willens, *Is Jay-Z A Bad Businessman? WiMP, Tidal, Struggling Streaming Music Services Raise Questions*, IBT (Feb. 18, 2015), http://www.ibtimes.com/jay-z-bad-businessman-wimp-tidal-struggling-streaming-music-services-raise-questions-1820460 (last visited May 6, 2016).

[14]     *Id*. (internal quotes omitted).

*of Pablo*, on Tidal.[15]

**Exclusive Release of *The Life of Pablo***

28.     Defendant West is known the world over for his artistic contributions and

innovations to the rap genre. Mr. West is a musical paragon, with twenty-one Grammy awards,

three albums included on the 2012 *Rolling Stone* "500 Greatest Albums of All Time" list, and the

honor of having been selected as one of Time Magazine's most influential people in the world,

twice.[16]

29.     Due to Mr. West's unbridled success and outspoken social media presence,[17] his

Twitter feed is regularly at the center of a maelstrom of discussion and scrutiny by both the

media and public at large.[18] As a result, Mr. West has developed a robust and devout fan base,[19]

with nearly *22 million* Twitter followers (although he himself only follows one person) and

tweets that are often widely reported on by the popular media.

30.     Despite Mr. West's wild success and popularity, and his personal claim as the

---

[15]     *See* Jamieson Cox, *Kanye West's new album Swish is coming out on February 11th*, The Verge (Jan. 8, 2016), http://www.theverge.com/2016/1/8/10739674/kanye-west-swish-new-album-release-date/in/10737069 (last visited May 6, 2016) (reporting on Mr. West's announcement that his album (then titled "Swish") would be released in February, 2016).

[16]     *See 500 Greatest Albums of All Time*, Rolling Stone (May 31, 2012), http://www.rollingstone.com/music/lists/500-greatest-albums-of-all-time-20120531 (last visited May 6, 2016); *Kanye West*, The Grammys, http://www.grammy.com/artist/kanye-west (last visited May 6, 2016); Kadeen Griffiths, *Kanye West Makes TIME Magazine's Most Influential Cover & There's A Good Reason He Was Chosen For The Honor*, Bustle (April 16, 2015), http://www.bustle.com/articles/76739-kanye-west-makes-time-magazines-most-influential-cover-theres-a-good-reason-he-was-chosen (last visited May 6, 2016).

[17]     *See* Harriet Gibsone, *No such thing as bad PR: Is social media saving or damaging the music industry*, the guardian (Feb. 19, 2016), http://www.theguardian.com/music/2016/feb/19/social-media-damaging-music-industry-pr-twitter-kanye-west (last visited May 6, 2016) (noting Mr. West's use of Twitter as part of the promotional process of his personal celebrity "brand").

[18]     *See #YeezySeason by the numbers: A look at Kanye West's beautiful dark twisted February on social media*, cramer-krasselt, http://c-k.com/yeezyseason-by-the-numbers-a-look-at-kanye-wests-beautiful-dark-twisted-february-on-social-media/ (last visited May 6, 2016) (discussing the use of a social media monitoring tool to identify over ten million conversations using keywords associated with Mr. West in blogs, social media platforms, Twitter, and traditional news sites in February 2015 alone).

[19]     *See Kanye West*, Twitter, https://twitter.com/kanyewest (last visited May 6, 2016).

---

most influential person in the world,[20] he has been plagued with an extraordinary amount of debt, which he declares currently exceeds fifty million dollars.[21] During this time of financial difficulty for Mr. West (and concurrent with Tidal's fiscal failings), he announced that his album would be available on Tidal in early 2016.[22] It quickly became one of the most anticipated albums of 2016.[23] As the release date arrived, Tidal marketed the exclusivity of the album, announcing to the world, via Twitter, that the album was streaming "exclusively" via Tidal. *See* Figure 2.



Figure 2.[24]

31.    In the same 24 hour period, Mr. West himself, in his capacity both as an artist and owner of Tidal, reaffirmed Tidal's statement of exclusivity by stating that his album would *only*

[20]    *See* Emily Smith, *'Don't f–k with me': Hear Kanye's uncensored 'SNL' meltdown* (Feb. 17, 2016), http://pagesix.com/2016/02/17/dont-f-k-with-me-hear-kanyes-uncensored-snl-meltdown/ (last visited May 6, 2016).

[21]    *See* Emily Jane Fox, *Kanye West's $53 Million Debt, Explained*, Vanity Fair (Feb 17, 2016), http://www.vanityfair.com/news/2016/02/kanye-west-53-million-dollar-debt-explained (last visited May 6, 2016).

[22]    *See* Jamieson Cox *Kanye West's new album Swish is coming out on February 11th*, The Verge (Jan. 8, 2016), http://www.theverge.com/2016/1/8/10739674/kanye-west-swish-new-album-release-date/in/10737069 (last visited May 6, 2016) (reporting on Mr. West's announcement that his album (then titled "Swish") would be released in February, 2016).

[23]    *See* Tim Ingham, *Kanye West Says His New Album 'Will Only Be on Tidal'. Sadly, He's Wrong*, Music Business Worldwide (Feb. 16, 2016), http://www.musicbusinessworldwide.com/kanye-west-says-new-album-will-tidal-sadly-hes-wrong/ (last visited May 6, 2016) (discussing the fervor of anticipation over *The Life of Pablo* and the resulting piracy frenzy).

[24]    *Tidal*, Twitter, https://twitter.com/TIDALHiFi (last visited May 6, 2016).

be available on the Tidal streaming platform. Mr. West, as a part owner of Tidal, is an agent of the company and therefore capable of making representations on its behalf, including statements about his music appearing on the platform. *See* Figure 3.

KANYE WEST @kanyewest · Feb 15

My album will never never never be on Apple. And it will never be for sale... You can only get it on Tidal.

37K   51K

Figure 3.[25]

32.     Mr. West's statement was a clear and unqualified representation that *The Life of Pablo* would be a permanent exclusive on Tidal.

33.     And Mr. West's declaration was not limited to the Twitterverse. Due to his personal and professional fame, and the massive amounts of hype and press coverage associated with the release of *The Life of Pablo*, numerous news outlets broadcast Mr. West's decree to the world with headlines like "Kanye West says his new album will be a permanent Tidal exclusive," "Kanye West says The Life Of Pablo Tidal exclusive," "Kanye West Says 'The Life Of Pablo' 'Will Never Be For Sale,'" and "Kanye West: You can only get The Life of Pablo on TIDAL."[26]

---

[25]     *Kanye West,* Twitter https://twitter.com/kanyewest (last visited May 6, 2016).
[26]     *See* Angus Walker, *Kanye West Says "The Life Of Pablo" "Will Never Be For Sale"*, Hot New Hip Hop (Feb. 15, 2016), http://www.hotnewhiphop.com/kanye-west-says-the-life-of-pablo-will-never-be-for-sale-news.20192.html (last visited May 6, 2016) (noting that Mr. West's representations that *The Life of Pablo* would be "confined to TIDAL"); Victor Luckerson, *Kanye West Is Making a Big, Risky Bet With Pablo*, TIME (Feb. 16, 2016), http://time.com/4226074/kanye-west-life-pablo-tidal/ (last visited May 6, 2016) (reporting that *The Life of Pablo* would be available exclusively on Tidal based upon Mr. West's tweet); Sam Barsanti, *Kanye West says The Life Of Pablo Tidal exclusive*, A.V. Club (Feb. 15, 2016), http://www.avclub.com/article/kanye-west-says-life-pablo-now-tidal-exclusive-232299 (last visited May 6, 2016); Jacob Kastrenakes, *Kanye West says his new album will be a permanent Tidal exclusive*, The Verge (Feb. 15, 2016), http://www.theverge.com/2016/2/15/11008932/kanye-life-of-pablo-tidal-exclusive-permanently (last visited May 6, 2016).

CLASS ACTION COMPLAINT                          10                          CASE NO. 3:16-CV-02013

34.     Consumers flocked to Tidal at a frenzied pace after Mr. West declared it would be the exclusive source of his album, and as a result, Tidal's subscription numbers skyrocketed.[27]

35.     Within the first ten days of *The Life of Pablo's* release, it was streamed over 250 million times and subscriber numbers eventually climbed from 1 million to 3 million.[28] This drastic increase was attributed directly to Mr. West (*See, e.g.,* the headlines "Kanye West's 'The Life Of Pablo' Reportedly Doubles TIDAL Subscriptions" and "Kanye West's New Album Saving Tidal").[29] Even Mr. West boasted his own impact on Tidal's subscriber numbers. *See* Figure 4.

KANYE WEST @kanyewest · Mar 2
# hash tag you raised Tidal's subscriptions by a whopping 💀💀💀 downloads

↩     ↕ 5.1K     ♥ 16K     ...

Figure 4.

36.     The permanent exclusivity announcements also pushed the Tidal mobile application to the very top of the download charts. *See* Figure 5.

---

[27]     *See* Stuart Dredge, *Tidal Riding High in US App Store's Top-Grossing Chart*, music :) ally (March 17, 2016), http://musically.com/2016/03/17/tidal-riding-high-in-us-app-stores-top-grossing-chart/ (last visited May 6, 2016);

[28]     *See* Danette Chavez, *Reports of The Life Of Pablo's Tidal exclusivity have been greatly exaggerated*, A.V. Club (April 1, 2016), http://www.avclub.com/article/reports-life-pablos-tidal-exclusivity-have-been-gr-234694 (last visited May 6, 2016); *see also* Joe Coscarelli, *400 Million Streams Later, Kanye West's 'Pablo' Gets a Wider Release*, The New York Times (March 31, 2016), http://www.nytimes.com/2016/04/02/arts/music/kanye-west-life-pablo-tidal-streams.html?_r=0 (last visited May 6, 2016) (noting that songs from the album had been streamed over 400 million times as of March 31, 2016).

[29]     *See* Danny Schwartz, *Kanye West's 'The Life Of Pablo' Reportedly Doubles TIDAL Subscriptions* (Feb. 23, 2016), http://www.hotnewhiphop.com/kanye-wests-the-life-of-pablo-reportedly-doubles-tidal-subscriptions-news.20313.html (last visited May 6, 2016); Mark Lelinwalla, *Kanye West's New Album Saving Tidal* (Feb. 23, 2016), http://www.techtimes.com/articles/135993/20160223/kanye-wests-new-album-saving-tidal.htm (last visited May 6, 2016).

---

CLASS ACTION COMPLAINT                    11                    CASE NO. 3:16-CV-02013

Figure 5.[30]

**The Unannounced Wide Release of *The Life of Pablo***

37.     After reaping the benefits of the announced "exclusivity" with the Tidal platform, Mr. West quickly changed his tune.

38.     A month and a half after releasing *The Life of Pablo*, Mr. West publicly announced that his album would be available through numerous other media streaming platforms.[31]

39.     Specifically, Mr. West announced that the album would also be available for purchase through his own website (https://shop.kanyewest.com), and that it would be available for streaming through both Spotify and Apple Music (competitors of Tidal), which would now allow the album to be streamed for free.[32]

40.     At all times, Defendants SCE and Mr. West knew that *The Life of Pablo* would

---

[30]     *Kanye West,* Twitter, https://twitter.com/kanyewest (last visited May 6, 2016).

[31]     *See Kanye West makes The Life of Pablo available outside Tidal*, The Guardian (April 1, 2016), http://www.theguardian.com/music/2016/apr/01/kanye-west-life-of-pablo-stream-download-spotify-itunes-tidal (last visited May 6, 2016).

[32]     *See id.*; *see also Kanye West*, Twitter (March 31, 2016), https://twitter.com/kanyewest (last visited May 6, 2016) (providing hyperlink to an online marketplace for the purchase of *The Life of Pablo* on Mr. West's Twitter feed).

not be available exclusively through the Tidal streaming platform. Despite this knowledge, they supported the charade by making representations that the album would be a Tidal exclusive, either in their capacity as individuals or through Tidal as owners of the platform. Defendants knew that consumers would subscribe to Tidal only to get access to the new album, and in fact promoted that very fact. *See* Figure 6.



Figure 6.

41.     As such, Mr. West and SCE deceived consumers into believing that *The Life of Pablo* would only be available through the Tidal streaming service, when in fact it knew that statement to be false.

**Defendants Materially Benefited From Their Misrepresentations**

42.     Defendants reaped enormous benefits from the mass influx of new subscribers and the treasure trove of consumer data they collected from them.

43.     New companies like Tidal rely on user metrics to value their company for investors, potential buyers, and IPO pricing. For example, Facebook purchased WhatsApp for $19 billion ($42 per user), when it had less than $20 million in revenue. The market consensus was that the price, and choice to purchase the company at all, was based largely upon WhatsApp's massive and growing user base and incredible cache of user data.[33] A similar metric

---

[33]     *See* Steven Russolillo, *How to Value Facebook's $19 Billion WhatsApp Deal* (Feb. 21, 2014), blogs.wsj.com/moneybeat/2014/02/21/how-to-value-facebooks-19-billion-whatsapp-deal (last visited on May 6, 2016) ("The deal initially elicited some sticker shock on Wall Street, but analysts and shareholders have increasingly come around to the fact that Facebook is paying up for WhatApp's vast user base… Some back-of-the-envelope math shows Facebook is paying just $42 per WhatsApp user, whereas Facebook trades at $145 per user and Twitter trades at $128 per user… Putting the fundamentals aside for a second, he notes that the market is clearing pricing many of these social-media companies on users, user growth and engagement.")

can be applied to Facebook's 2012 purchase of Instagram for $1 billion, or around $30 per user.[34] Using the price per user metrics applied to WhatsApp and Instagram, the inflation of Tidal's user base translates to between $60 and $84 million in ascertainable new value.

44.     Defendant SCE knows the value of subscribers all too well. So well, in fact, that it is preparing to sue the two entities it purchased the Tidal platform from for allegedly overinflating subscriber numbers. SCE is reportedly seeking at least $15 million back from its $57 million purchase price because "the total number of subscribers was actually well below the 540,000 reported to us by the prior owners."[35] Based on its own math, the added value of the new subscribers and their information gained through *The Life of Pablo* false representations would be at least $60 million to the company's overall value.

45.     With each new user added comes a wealth of user information. In order to subscribe to Tidal, consumers are required to provide their email address and other contact information, which may include links to their personal social media accounts, including Facebook, Twitter, and Last.fm.[36] Each linking to a social media account provides Tidal with an even wider array of user data and information. Additionally, in order to secure certain package "plans," consumers may be prompted to provide Tidal with information regarding the school they attend (or previously attended), or even their current military status and branch of service.[37]

---

[34]     *See Why Instagram is worth $1B to Facebook* (April 10, 2012), http://fortune.com/2012/04/10/why-instagram-is-worth-1b-to-facebook/ (last visited May 6, 2016) (Facebook acquired Instagram for about $30 per user, or $1 billion. ($30/user X 33M users = $1B). Facebook is valued at about $100 per user or $80 billion ($100/user X 800M users = $80Bn). Other popular social apps are valued around $20 to $50 per user. The monetization models need to work out about the same to justify the valuations.") *See also* Tristan Louis, *How Much Is A User Worth?* (Aug. 31, 2013), http://www.forbes.com/sites/tristanlouis/2013/08/31/how-much-is-a-user-worth/#febe46592a9b (last visited May 6, 2016).

[35]     *See* Kylie Noble, *Jay Z 'preparing to sue' former Tidal owners* (Mar. 31, 2016), http://www.theguardian.com/media/2016/mar/31/jay-z-tidal-owners-schibsted-verdane (last visited May 6, 2016).

[36]     The sign up process also includes a *pre-checked* box that states, "Sign up for the TIDAL Editorial Newsletter and get weekly updates from our music experts."

[37]     *See TIDAL Student Plan information verification portal*, TIDAL, https://verify.sheerid.com/tidal-student/?vsid=464a1150-ae0d-4b99-863a-9fc6ee1ff63d (last

---

46.     After consumers provide this mandatory information in exchange for access to Tidal, the streaming service seeks even more data about each of its subscribers—including their location, gender, phone number, and birthday—in order to develop a more accurate (and valuable) profile of each consumer.

47.     Alarmingly, Tidal specifically targets the "personal information" of minors as young as 13 years old. For example, its Terms of Use state that "If you are between 13 and 17 years of age, when you visit, browse, use, *or submit personal information*" to Tidal, you "represent that you have the permission of a parent of guardian" to do so.[38]

48.     Once a consumer completes the sign up process and starts using the service, Tidal begins collecting a massive amount of analytics data, user habits, and browsing history.[39] By increasing their user base multiple times over, Tidal is able to create valuable usage information to aid them in better monetizing their site as well sharing with or selling that information to third parties (such as record labels, artists on its platform, and other media companies).

49.     As a result of their misrepresentations, each Defendant, as a stakeholder of Tidal, benefitted from having their shares of Tidal increase in value.

### FACTS SPECIFIC TO PLAINTIFF BAKER-RHETT

50.     Plaintiff Baker-Rhett is a fan of Defendant Kanye West's music.

51.     Immediately after viewing Mr. West's February 15, 2016 announcement proclaiming that *The Life of Pablo* would be available exclusively on Tidal, Plaintiff Baker-Rhett downloaded and subscribed to the service in order to gain access to the album. As part of the sign up process, Plaintiff Baker-Rhett was required to provide Tidal with his personal and

---

visited April 11, 2016); *TIDAL Military Plan information verification portal*, TIDAL, https://verify.sheerid.com/tidal-military/?vsid=93e65bdb-18ff-47d8-9adc-eac64ff89ebd (last visited May 6, 2016).
[38]     *See Tidal Terms of Use*, http://tidal.com/us/terms (last visited May 6, 2016). (Emphasis added.)
[39]     *See Install*, TIDAL, http://tidal.com/us/download (last visited May 6, 2016) (identifying numerous devices and operating systems that Tidal can be utilized through, each of these methods of accessing Tidal has the potential to generate an additional wealth of data for each unique Tidal user's habits that can then be capitalized on in addition to their basic information).

payment information so Tidal could charge him for a subscription to its music-streaming platform after the free trial period ended.

52. After subscribing to Tidal, Plaintiff Baker-Rhett began to stream *The Life of Pablo* album that same day.

53. Plaintiff Baker-Rhett subscribed to Tidal specifically because he was misled into believing that it was the only music platform on which *The Life of Pablo* album would ever be available.

54. This was a result of viewing Tidal's and Mr. West's announcements and representations that *The Life of Pablo* would only ever be available on Tidal.

55. Had Plaintiff Baker-Rhett known that Mr. West's album would be available to stream through other platforms besides Tidal, particularly those that offer the album for free or one in which he already pays for (*e.g.*, his paid Spotify account), he would not have downloaded the Tidal app, provided his personal information, or paid for a subscription to Tidal's streaming service (for which he was charged $9.99 in March 2016).

56. Plaintiff cancelled his subscription after finding out that *The Life of Pablo* was not a Tidal exclusive and before he was charged a second time.

## CLASS ALLEGATIONS

57. **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a class and subclass of similarly situated individuals, defined as follows:

> **Class**: All persons in the United States who (1) subscribed or renewed their subscription to the Tidal streaming platform, (2) between February 15, 2016 and April 1, 2016, (3) and who streamed any track from *The Life of Pablo* album during the first 24 hours after subscribing.

> **California Subclass**: All Class members who reside in the State of California.

The following people are excluded from the Class and California Subclass (collectively the

"Class," unless otherwise indicated): (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

58.    **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals. Class members can be easily identified through Defendants' records.

59.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a)    whether Defendants' representations were designed to mislead consumers into subscribing to the Tidal streaming service;

b)    whether Defendants' conduct described herein violates California's False Advertising Law (Cal. Bus. & Prof. Code § 17500);

c)    whether Defendants' conduct described herein violates California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.);

d)    whether Defendants' conduct described herein constitutes fraudulent inducement; and

e)    whether Defendants have been unjustly enriched as a result of the conduct described herein.

60.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

61.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

62.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect the members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

63.    **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision

by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On Behalf of Plaintiff and the California Subclass)**

64.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.     Defendants engaged in advertising and marketing to consumers throughout the United States, including in California, that encouraged them to subscribe to Tidal by promising them that *The Life of Pablo* album would be exclusive to its music-streaming service.

66.     Specifically, Mr. West—via his Twitter account—represented to his fans and the public at large that the album would only be available through the Tidal platform. Mr. West made this representation knowing that various media outlets would ensure it was broadcast to consumers the world over—in particular, consumers of his music. Moreover, SCE and Mr. West also represented to consumers that Tidal would be the exclusive method of listening to the album via Tidal's Twitter feed and other representations made by Tidal. SCE then failed to correct any statements made by Mr. West, or otherwise indicate that the album would not be a permanent exclusive on Tidal.

67.     Defendants did so with the intent to induce Plaintiff and the California Subclass members to subscribe to Tidal's streaming platform.

68.     Despite their public advertising and marketing statements that *The Life of Pablo* would only be available via the Tidal music-streaming platform, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

69.     Defendants' advertising and marketing statements regarding the exclusivity of *The Life of Pablo* album were untrue, misleading, and likely to deceive the public inasmuch as their advertisements and statements caused reasonable consumers to mistakenly believe that *The Life of Pablo* would only be available via the Tidal music-streaming platform.

70.     Accordingly, in making and disseminating the statements regarding the

exclusivity of *The Life of Pablo* album alleged herein, Defendants knew or should have known that their statements were false and misleading and, therefore, in violation of Cal. Bus. & Prof. Code § 17500.

71.     Plaintiff and members of the California Subclass relied on Defendants' statements in deciding to subscribe to the Tidal music-streaming platform.

72.     But for Defendants' false and misleading advertisements and marketing statements, Plaintiff and the California Subclass members would not have subscribed to Tidal.

73.     Thus, as a direct and proximate result of Defendants' false advertising, Plaintiff and the California Subclass have suffered injury in fact and lost monies to Defendants.

74.     Accordingly, Plaintiff seeks an order (1) requiring Defendants to restore to the California Subclass members all monies acquired by means of false advertising (restitution); and, (2) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

77.     The UCL prohibits any unfair, unlawful, or fraudulent business acts or practices. A business practice need only meet one of these three criteria to be considered unfair competition.

78.     As described herein, Defendants engaged in unfair business practices by, among other things, misrepresenting that *The Life of Pablo* album would only be available via the Tidal music-streaming platform and using the misrepresentations to induce consumers (like Plaintiff and the California Subclass) into subscribing to their music-streaming platform when, in fact, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

79.   The exclusive availability of *The Life of Pablo* on the Tidal streaming platform was a material term in Plaintiff and the California Subclass's transactions with Tidal because it directly affected Plaintiff Baker-Rhett's and the California Subclass members' choices to subscribe to the streaming service. Specifically, it was a material term in determining whether Plaintiff and the California Subclass would provide their personal information, social media information, and credit card information to Tidal.

80.   Plaintiff and the California Subclass chose to subscribe to Tidal specifically because of these promises that *The Life of Pablo* album would only be available via the Tidal.

81.   Unfortunately, Defendants' promises were false. Contrary to Mr. West and SCE's representations—and the general consensus among Plaintiff Baker-Rhett, members of the California Subclass, and the world at large—that *The Life of Pablo* would only be available via the Tidal music-streaming platform, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

82.   Plaintiff Baker-Rhett, the California Subclass, and the public generally, reasonably viewed the statements made by Mr. West and SCE via Twitter—and rebroadcast by the media—regarding *The Life of Pablo* as true, and as a direct and proximate result, subscribed to Tidal based on those representations that it would be the exclusive source of the album. As such, Defendants' promises were material.

83.   Accordingly, had Plaintiff and the California Subclass known that *The Life of Pablo* was not a Tidal only exclusive, they would not have been willing to provide their personal information, social media information, and credit card information to Tidal, or otherwise subscribe to Tidal.

84.   Under the UCL, an "unfair" business practice is one that offends an established public policy or is otherwise immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Defendants violated the UCL's "unfair" prong by causing substantial injury to consumers through the conduct described above. The injuries caused by Defendants'

unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and could not have reasonably been known by consumers. Given the information asymmetry between Defendants and consumers regarding the actual exclusivity of *The Life of Pablo* album, Plaintiff and the California Subclass could not reasonably have known of the falsity of Defendants' representations or avoided the harm they caused.

85.     An "unlawful" business practice under the UCL is one that violates a federal, state, or local law. Defendants violated the UCL's "unlawful" prong because, as described in the First Cause of Action above, their conduct described above constitutes a violation of California's False Advertising Law.

86.     Pursuant to Cal. Bus. & Prof. Code §§ 17203 and/or 17204, Plaintiff Baker-Rhett seeks an Order requiring Defendants: (1) to restore to the California Subclass members all monies acquired by means of false advertising (restitution); and, (2) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

### THIRD CAUSE OF ACTION
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

87.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

88.     To induce Plaintiff and the Class into subscribing to Tidal's music streaming service, Mr. West and SCE affirmatively and intentionally misrepresented, made false statements about, and/or omitted facts about the different mediums through which *The Life of Pablo* would be available.

89.     By and through these methods, Mr. West and SCE fraudulently induced Plaintiff Baker-Rhett and the members of the Class into subscribing to Tidal and streaming *The Life of Pablo* through the service. In particular, Mr. West—via his Twitter account—represented to his fans and the public at large that the album would only be available through the Tidal platform. Mr. West made this representation knowing that various media outlets would ensure it was broadcast to the world. Moreover, SCE and Mr. West also represented that Tidal would be the

exclusive method of listening to the album via Tidal's Twitter feed and other representations made by Tidal. SCE then failed to correct any statements made by Mr. West, or otherwise indicate that the album would not be a permanent exclusive on Tidal.

90.     Mr. West and SCE's representations were in fact false. *The Life of Pablo* was not permanently exclusive through the Tidal streaming platform. Moreover, not only was *The Life of Pablo* made available through Tidal's competitors, but it was made available through platforms that provided free access to the album.

91.     The representations made by Mr. West and SCE about *The Life of Pablo* being exclusively available through Tidal were material terms in Plaintiff's and the Class's transactions with Tidal because they directly affected Plaintiff Baker-Rhett and the Class members' choices to subscribe to the streaming service. Specifically, it was a material term in determining whether Plaintiff and the Class would provide their personal information, social media information, and credit card information to Tidal.

92.     Mr. West and SCE intentionally made the aforementioned misrepresentations for the purpose of inducing Plaintiff Baker-Rhett and the Class members into signing up for Tidal. Plaintiff Baker-Rhett and the Class members did in fact rely upon these misrepresentations when they subscribed to Tidal's streaming services.

93.     Plaintiff Baker-Rhett and the Class justifiably relied on the statements made by Mr. West and SCE via Twitter—and rebroadcast by the media—regarding *The Life of Pablo* as true, and subscribed to Tidal based on those representations. Mr. West, as an owner of Tidal, is an authorized agent of Tidal and capable of making representations on its behalf. Moreover, statements made on Twitter regarding concrete and material aspects of a product or service, (in this case the exclusivity of *The Life of Pablo*), are actionable advertisements and representations.

94.     Plaintiff and members of the Class—including minors as young as 13 years old— would not have submitted their personal contact information, credit card information, other personal details, or agreed to a negative option trial had they known that Mr. West's album

would be available through platforms other than Tidal.

95.     In light of the foregoing, Plaintiff Baker-Rhett seeks an order requiring Mr. West and SCE to pay actual and compensatory damages. Plaintiff further requests that if the Court finds that Mr. West and SCE's conduct and misrepresentations were made with malice and in conscious disregard for Plaintiff Baker-Rhett and the Class's rights, they should be awarded punitive damages against Mr. West and SCE in an amount to deter such conduct in the future. Further, Plaintiff seeks an order requiring all personal and credit card information wrongly acquired by Defendants be destroyed, an order directing Defendants to cancel the negative option aspects of all outstanding free trials created during the class period, and an order directing Defendants to cease any monetization efforts relying on Class members' information.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
***In the Alternative to Counts 1-3***
**(On Behalf of Plaintiff and the Class)**

96.     Plaintiff incorporates the foregoing allegations as if fully set forth herein, excluding paragraphs 60-91.

97.     Defendants have knowingly received and retained benefits from Plaintiff Baker-Rhett and the Class through a fraudulent scheme that would render it unjust to allow them to retain such benefits. Specifically, Defendants have received and retained Plaintiff Baker-Rhett and the Class members' money, personal information, credit card information, and social media account details, which Plaintiff Baker-Rhett and the Class members submitted under false pretenses because of the misrepresentation that *The Life of Pablo* would be available exclusively through Tidal.

98.     Defendants benefitted through the fraudulently induced subscriptions because the massive influx of new subscribers and data about members of the Class (which includes minors as young as 13 years old) materially increased the value of Tidal. As owners of the Tidal streaming service, each Defendant benefitted by having the value of their stake in the company increased as a direct result of the misrepresentations, as well as other direct monetary benefits.

99.     Defendants appreciate and have knowledge of such benefits.

100.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money, credit card information, and personal information belonging to Plaintiff Baker-Rhett and the Class, or the increased value of their equity in Tidal that they unjustly received as a result of its wrongful conduct described herein.

101.    Accordingly, Plaintiff Baker-Rhett, individually and on behalf of the Class, seeks restitution and disgorgement of all monies unjustly received and retained by Defendant. Further, Plaintiff seeks an order requiring all personal and credit card information wrongly acquired by Defendants be destroyed, an order directing Defendants to cancel the negative option aspects of all outstanding free trials created during the class period, and an order directing Defendants to cease any monetization efforts relying on Class members' information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Baker-Rhett, individually and on behalf of the Class, respectfully requests that the Court enter an order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Baker-Rhett as representative of the Class, and appointing his counsel as Class Counsel;

B.      Declaring that Defendants' actions, as set out above, constitute violations of California's False Advertising Law (Cal. Bus. & Prof. Code § 17500) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), fraudulent inducement, and that they were unjustly enriched as a result;

C.      Awarding actual damages and punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding appropriate restitution to Plaintiff Baker-Rhett and the Class in an amount to be determined at trial;

E.      Requiring Defendants to cease all monetization efforts that rely on their personal

1  data;

2      F.     Requiring the destruction of all personal data in Defendants possession belonging

3  to Plaintiff and members of the Class;

4      G.     Requiring Defendants to cancel the negative option aspects of all outstanding free

5  trials created during the class period;

6      H.     Awarding injunctive and other equitable relief as is necessary to protect the

7  interests of the Class, including, *inter alia,* an order prohibiting Defendants from engaging in the

8  wrongful and unlawful acts described herein;

9      I.     Awarding reasonable litigation expenses and attorneys' fees;

10      J.     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

11  allowable; and

12      K.     Awarding such further and other relief the Court deems reasonable and just.

13                          **JURY TRIAL**

14      Plaintiff demands a trial by jury for all issues so triable.

15                                      Respectfully submitted,

16                                      **JUSTIN BAKER-RHETT**, individually and on
                                        behalf of all others similarly situated,
17

18  Dated: May 6, 2016                  By:   /s/ Todd M. Logan
                                              One of Plaintiff's Attorneys
19

20  Jay Edelson*                            Todd M. Logan (SBN 305912)
    jedelson@edelson.com                    tlogan@edelson.com
21  EDELSON PC                              EDELSON PC
    350 North LaSalle Street, 13th Floor    329 Bryant Street, Suite 2C
22  Chicago, Illinois 60654                 San Francisco, California 94107
    Tel: 312.589.6370                       Tel: 415.212.9300
23  Fax: 312.589.6378                       Fax: 415.373.9435

24  *Motion for admission                   *Counsel for Plaintiff and the Putative Class*
    pro hac vice to be filed.*
25

26

27

28